# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| SMARTSIGNAL CORPORATION, | ) Civil Action No. 02 CV 7682 |
| Plaintiff, | ) Honorable Judge Virginia M. Kendall |
| v. | ) Magistrate Judge Martin C. Ashman |
| EXPERT MICROSYSTEMS, INC., | ) |
| Defendant. | ) |

## SMARTSIGNAL'S OPPOSITION TO EXPERT MICROSYSTEMS' UNTIMELY MOTION TO MODIFY THE STIPULATED PROTECTIVE ORDER

Date: February 10, 2006

/s/ Christine A. Abuel
Steven C. Schroer
Christine A. Abuel
FITCH, EVEN, TABIN & FLANNERY
120 South LaSalle Street, Suite 1600
Chicago, Illinois 60603
Telephone: (312) 577-7000
Facsimile: (312) 577-7007

*Counsel for SmartSignal Corporation*

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III. BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A. Procedural Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B. EM's Belated and Improper Demands for Disqualification . . . . . . . . . . . . . . . . . 3

    C. Venture Gain . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

IV. EM'S WOEFULLY BELATED REQUEST FOR A RESTRICTIVE PROTECTIVE ORDER SHOULD BE REJECTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    A. EM Fails to Meet its Exceptionally High Burden to Justify the Order it Seeks . . 6

        1. The Relief Sought Would Abrogate SSC's Right to Counsel of Its Choice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        2. Federal Circuit Caselaw Trumps the Cases Cited by EM, and Better Reasoned District Court Cases Reject EM's Theory . . . . . . . . . . . 7

    B. EM Is Barred by the Equitable Doctrines of Laches, Waiver and Estoppel from Raising its Present Objections to the Stipulated Protective Order . . . . . . . 11

V. THE VENTURE GAIN RED HERRING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

VI. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

i

**TABLE OF AUTHORITIES**

**Page**

**Cases**

*AFP Advanced Food Products, LLC v. Snyder's of Hanover Mfg., Inc.*,
    2006 U.S. Dist. LEXIS 426 (E.D. Pa. January 6, 2006) . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Alexian Bros. Health Providers Assoc., Inc. v. Humana Health Plan, Inc.*,
    330 F.Supp.2d 970 (N.D. Ill. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*American Telephone and Telegraph Co. v. Grady*,
    594 F.2d 594 (7th Cir. 1978), *cert. denied,* 440 U.S. 971 (1979) . . . . . . . . . . . . . . . . . . 6

*DeVito v. Chicago Park District*,
    270 F.3d 532 (7th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*First Nat'l Bank v. St. Charles Nat'l Bank*,
    504 N.E.2d 1257 (Ill. App. Ct. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Gulf Oil Co. v. Bernard*,
    452 U.S. 89, 102 n.16 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Gullien v. City of Chicago*,
    956 F. Supp. 1416 (N.D. Ill. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Horbach v. Kaczmarek*,
    915 F.Supp. 18 (N.D. Ill. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*In re Possession and Control of the Commissioner of Banks
and Real Estate of Independent Trust Corp.*,
    327 Ill.App.3d 441, 764 N.E.2d 66 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*In re Sibia Neurosciences*,
    1997 U.S. App. LEXIS 31828, *1-2 (Fed. Cir. October 22, 1997) . . . . . . . . . . . . . . . 9, 10

*Indiana v. Haws*,
    131 F.3d 1205 (7th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Interactive Coupon Marketing Corp. v. H.O.T.! Coupons LLC*,
    1999 U.S. Dist. LEXIS 12437 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Jepson, Inc. v. Makita*,
    30 F.3d 854 (7th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Matsushita Elec. Indus. Co., Ltd. v. U.S.*,
    929 F.2d 1577 (Fed. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-10

*Medimmune, Inc. v. Centocor, Inc.*,
    271 F.Supp. 2d 762 (D. Md. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Motorola, Inc. v. Interdigital Tech. Corp.*,
    1994 U.S. Dist. LEXIS 20714, *15 (D. Del. December 19, 1994) . . . . . . . . . . . . . . . . . 11

*Panduit Corp. v. All States Plastic Manuf. Co.*,
    744 F.2d 1564 (Fed. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Powell v. Alabama*,
    287 U.S. 45 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Richard Wolf Medical Instruments Corp. v. Dory*,
    130 F.R.D. 389 (N.D. Ill. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Sibia Neurosciences, Inc. v. Cadus Pharmaceutical Corp.*,
    1997 U.S. Dist. LEXIS 24130 (S.D. Ca. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Tanner v. Board of Trustees*,
    121 Ill. App. 3d 139, 459 N.E.2d 324 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*TIC United Corp. v. Lisowski*,
    1994 U.S. Dist. LEXIS 14765, *21-22 (N.D. Ill. Oct. 17, 1994) . . . . . . . . . . . . . . . . . . 12

*Trading Technologies Int'l, Inc. v. eSpeed, Inc.*,
    2004 U.S. Dist. LEXIS 19429 (N.D. Ill. September 23, 2004) . . . . . . . . . . . . . . . . . . 9, 10

*U.S. Steel Corp. v. U.S.*,
    730 F.2d 1465 (Fed. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-10

*Viskase Corp. v. W.R. Grace & Co.*,
    1992 U.S. Dist. LEXIS 619, *11 (N.D. Ill. January 23, 1992) . . . . . . . . . . . . . . . . . . . . . 6

**I.     INTRODUCTION**

This patent infringement action has been pending since October 2002.[1]  A ***stipulated*** protective order was entered by the Court three years ago, on February 11, 2003.  At the time Defendant, Expert Microsystems, Inc. ("EM"), stipulated to the protective order, EM knew – because he signed the Complaint – that Mark W. Hetzler was the lead litigation attorney for plaintiff, SmartSignal Corporation ("SSC"), in this matter.  EM also knew from the public record of the U.S. Patent and Trademark Office ("PTO") that, at the same time, Mr. Hetzler was concurrently active as a patent prosecution attorney for SSC.  Notwithstanding this knowledge, EM stipulated to the existing protective order, which places no restrictions on either the patent prosecution duties or litigation duties which Mr. Hetzler owes to his client, SSC.

EM's stipulation to the protective order was an affirmative contractual acknowledgment that Mr. Hetzler's dual role was entirely proper (which it was then and remains today).  Absolutely nothing has changed in the past three years which would justify EM's complete about face on the subject, which is a blatant breach of its stipulation three years ago.  Moreover, as shown below, EM's motion fails to carry the heavy burden imposed by the case law to justify such restrictions, even if the motion were timely.

EM's attempt to deny SSC the litigation services of attorney R. Matthew Pipke is equally disingenuous.  EM was advised in writing ***eight months ago*** (Declaration of Mark W. Hetzler (hereinafter "Hetzler Decl."), ¶4 and Ex. A thereto) that Mr. Pipke had left the employ of SSC, had joined SSC's outside counsel, Fitch, Even, Tabin & Flannery, and would be making an appearance in this litigation.  Mr. Pipke did so on June 1, 2005.  SSC forthrightly informed EM of the circumstance, and expressly offered EM multiple opportunities to raise any concerns with the Court, while plainly explaining why there was no fair basis for any complaint (Hetzler Decl., *passim*).  Instead of approaching the Court, EM initiated a nasty letter-writing campaign on the subject.  After three months of argumentative letters, EM finally announced in writing that it would "file a motion ***no later than September 2, 2005***" (Hetzler Decl., Ex. I thereto).

---

[1] The matter was stayed for some time, as a result of EM's futile effort to have the U.S. Patent and Trademark Office ("PTO") reject the patent in two separate reexamination proceedings instituted by EM, which concluded in early 2005 when the PTO issued a reexamination certificate re-affirming all of the original claims, and allowing new claims covering the pioneering inventions described in the patent in suit. The reexaminations clearly show that EM has no chance of prevailing on an invalidity defense in this case, and it has never articulated any credible non-infringement arguments.  Its entire defense has collapsed into procedural wheel-spinning, of which the present motion is only the latest example.

September 2, 2005 came and went, but no motion was filed. Having delayed Mr. Pipke's active engagement in trial preparation for many months as a courtesy, and seeing no indication that EM was in fact serious about filing a motion, SSC was left to conclude that the matter was resolved (as it well should have been with several pre-trial deadlines set by the Court's scheduling order approaching). But SSC still waited. Finally, in mid-October 2005, six weeks after EM's stated deadline, Mr. Pipke began actively working on trial preparation and expert disclosures which – as the existing protective order clearly permitted – required him to have access to documents which EM had designated as restricted under the protective order. Thus, the issues raised by EM's present motion were effectively mooted by EM's conscious failure to meet its own self-announced deadline.

The relief sought by EM on this motion is not only untimely. It is utterly draconian. Ultimately, it is nothing short of a personal attack on the integrity of Messrs. Hetzler and Pipke, and a blatant attempt to use the device of a protective order as an improper means of gaining both unfair advantage in the marketplace (by denying SSC of the patent prosecution services of its long-term patent attorney, Mr. Hetzler), and severely prejudicing SSC in this litigation (by denying the effective counsel of Mr. Pipke, an attorney whose personal understanding of the patents and technology at issue will clearly make SSC's litigation efforts more efficient and less expensive).

## II. SUMMARY OF ARGUMENT

EM's motion is an improper attempt to deprive SSC of its chosen attorneys who have represented it in this litigation for over three years. As demonstrated below, EM's motion should be denied for multiple reasons.

First, EM has completely failed to meet the heavy burden to justify the drastic relief it seeks. The aberrational District Court cases it cites not only represent a minority view, but are also inconsistent with the Federal Circuit cases which control this issue.

Second, the equitable doctrines of laches, waiver, and estoppel bar EM from raising its objections to the protective order that has been in place in this litigation since February 2003. Simply stated, this motion comes three years too late. Further, EM set its own deadline to file a motion September 2, 2005. However, it never filed such a motion and SSC reasonably relied on EM's representation and inaction.

Third, the essential factual premise of the attack on Mr. Pipke is simply false. Venture Gain, LLC ("Venture Gain") does not compete with EM. EM is in nuclear power and turbine engines. Venture Gain's business activities are solely in the life science arena. EM' argument that it directly

competes with Venture Gain is based on a fantasy-land definition of "competition" and on self-serving, but incorrect, speculation by EM's principal, Randall L. Bickford.

## III. BACKGROUND

### A. Procedural Background

SSC brought this action on October 25, 2002 against EM for infringement of U.S. Patent No. 4,937,763 ("the '763 patent"). The infringing activities include EM's making, using, selling and/or offering to sell software products, including those employing the multivariate state estimation technique technology developed by Argonne National Laboratory and services for monitoring of industrial equipment, such as that used in nuclear power plants.

At the outset of the litigation, EM stipulated, and on February 11, 2003 the Court entered a straightforward confidentiality order which fully protected EM's stated concerns by directing that all confidential information designated under the protective order "shall be used only for the purpose of preparing for and conducting this action (including appeals) and not for any business, research, development, or other purpose whatsoever." The entire premise of this motion is EM's speculation that SSC or its counsel will violate this Court's order. However, no specific violation is alleged or shown.

### B. EM's Belated and Improper Demands for Disqualification

The parties engaged in discovery under the existing protective order until the case was stayed on August 15, 2003 due to EM's request for reexamination of the '763 patent. (Hetzler Decl., ¶17-18 and Exs. K & L thereto). Ultimately, EM's attack in the PTO completely failed, and a reexamination certificate issued on April 5, 2005. (*Id.* at ¶19 and Ex. M thereto). On January 27, 2005, this action was reinstated and the stay was lifted.

On May 31, 2005, Mark W. Hetzler (litigation counsel for SSC), advised Audrey A. Milleman (former counsel of record for EM), as a professional courtesy, that R. Matthew Pipke was no longer employed by SSC, that Mr. Pipke had rejoined the firm of Fitch, Even, Tabin & Flannery on January 1, 2005, and that Mr. Pipke would be filing his appearance in this action. (*Id.* at ¶4 and Ex. A thereto). Mr. Pipke filed his appearance on June 1, 2005. Thereafter, Ms. Milleman expressed concerns regarding a potential conflict due to Mr. Pipke's dual roles as a shareholder of SSC and outside counsel for SSC. (*Id.* at ¶5 and Ex. B thereto). As a result, Mr. Hetzler agreed, as a courtesy, that Mr. Pipke would not review EM's documents designated "confidential - attorneys' eyes only" to allow EM time to follow up on its concerns. (*Id.*)

After investigating, on July 19, 2005, Mr. Hetzler advised Ms. Milleman of his disagreement with EM's concerns. Specifically, there is no reason to restrict Mr. Pipke from access to "confidential - attorneys' eyes only" documents, because he is strictly a passive shareholder in SSC, with no managerial input or control, and he plays no role in the management of the company. (*Id.* at ¶6 and Ex. C thereto).

Persisting, Ms. Milleman reiterated their objection to Mr. Pipke's access to "attorneys' eyes only" documents, and raised a new objection to Mr. Pipke's access to documents, Mr. Pipke's position with Venture Gain. (*Id.* at ¶7 and Ex. D thereto). But Venture Gain's activities are in the area of life sciences; quite obviously unrelated to EM's markets (nuclear power plants and aerospace). (Declaration of R. Matthew Pipke (hereinafter "Pipke Decl."), ¶7). Accordingly, Mr. Hetzler explained in his responsive July 22, 2005 letter to Ms. Milleman that there was simply no competition between EM and :

> [EM], like SmartSignal, is in the business of industrial equipment monitoring, as confirmed in your client's Answer, Responses to Interrogatories and document production. As you noted in your letter, Venture Gain is in the life sciences. How can Mr. Bickford now reasonably claim this is competitive with his business in the equipment monitoring marketplace and, in particular, the powerplant and aircraft industries he has focused on?

(Hetzler Decl., ¶8 and Ex. E thereto).

Further letter-writing emanated from EM's new attorney, Mark L. Pettinari (*Id.* at ¶9 and Ex. F thereto). On August 19, 2005, Mr. Hetzler advised Mr. Pettinari that,

> Mr. Pipke is outside counsel of record for SmartSignal in this litigation, having filed his appearance on June 1, 2005, and, consequently, has been ordered to be bound by this Protective Order. We find no provision in the Protective Order denying Mr. Pipke access to the protected information.
>
> Thus, [SmartSignal intends] to provide access to the protected information [to Mr. Pipke]. However, we will refrain from doing to so ***for five business days so that [EM] can file a motion with the court seeking modification of the Protective Order***. We, however, will vigorously oppose any such motion.

(*Id.* at ¶10 and Exhibit G thereto) (emphasis added).

On August 23, 2005, Mr. Pettinari escalated the alleged dispute. In addition to reiterating EM's purported objections to Mr. Pipke's access to "attorneys' eyes only" documents, Mr. Pettinari for the first time raised an objection to Mr. Hetzler's role in prosecuting patent applications for SSC and in representing SSC in this litigation. He stated,

> In this context, please consider this letter as a formal request for you to respond to

4

> why a motion to disqualify you and your firm is inappropriate. **Please provide us with your response no later than the close of business on Monday, August 29, 2005, so that we may consider your position before filing a motion to disqualify with the Court.**
>
> As noted above, we do intend to seek protection from the Court regarding your intention to provide Mr. Pipke with access to confidential and proprietary documents and information produced to SmartSignal's counsel in this litigation. However, we strenuously object to your unilateral dictating when that motion must be filed. **We expect to file this motion no later than Friday, September 2, 2005**...

(*Id.* at ¶11 and Ex. H thereto) (emphasis added).

Steven C. Schroer, promptly responded on behalf of SSC August 25, 2005 stating,

> I am aware of no rule or statute prohibiting a patent prosecution attorney from providing litigation services. That practice has been commonplace in patent litigation for many decades, if not more than a century. Clients in such cases deserve and rightly expect the special skills of technically trained lawyers. Therefore, your suggestion that there is something untoward about Mr. Hetzler and Mr. Pipke acting as member of SmartSignal's outside trial team in this case is not persuasive and, in my opinion, backwards. If you provide specific authority to the contrary, I will be happy to consider it. However, standing alone, your arguments are not accepted, and your implicit attack on the integrity of these two fine lawyers is not well received.

(*Id.* at ¶12 and Ex. I thereto).

EM never filed the motion to disqualify, which it promised would be filed "no later than Friday, September 2, 2005." Instead, EM now (nearly six months later) seeks the same result indirectly, by asking the Court to modify the stipulated protective order in precluding Mr. Pipke from continued access to "confidential - attorneys' eyes only" documents and prohibiting Mr. Hetzler from prosecuting patent applications on behalf of SSC during the pendency of this litigation and for a period of two years after termination of this litigation.

### C. Venture Gain

Entirely separate from his role as an attorney, Mr. Pipke is an officer of Venture Gain, a small start up company. Venture Gain's business activities have always been exclusively in the area of life sciences. (Pipke Decl., ¶7-8). Venture Gain has done no business in and has no plans to do business in EM's markets, equipment monitoring in the nuclear power and aerospace industries. (*Id.* at ¶8). There is no overlapping ownership between Venture Gain, on the one hand, and any of the parties in this lawsuit, on the other hand. (*Id.* at ¶10). Moreover, there are no overlapping employees or customers between Venture Gain, on the one hand, and any of the parties in this lawsuit, on the other hand. (*Id.* at ¶11-12). Venture Gain's only relationship to any of the parties is an arm's length license from SSC in a limited field – life sciences – in which neither EM nor SSC

5

is doing business. (*Id.* at ¶7).

## IV. EM'S WOEFULLY BELATED REQUEST FOR A RESTRICTIVE PROTECTIVE ORDER SHOULD BE REJECTED

While SSC does not question this Court's ultimate discretion to modify the stipulated protective order entered three years ago, EM must satisfy a higher burden to warrant granting the relief it seeks. The Seventh Circuit has held that "where a protective order is agreed to by the parties before its presentation to the court, there is a higher burden on the movant to justify the modification of the order." *American Telephone and Telegraph Co. v. Grady*, 594 F.2d 594, 597 (7th Cir. 1978), *cert. denied,* 440 U.S. 971 (1979); *see also Richard Wolf Medical Instruments Corp. v. Dory*, 130 F.R.D. 389, 392 (N.D. Ill. 1990) (Bucklo, U.S.M.). This is particularly so where the proposed modification relates to a matter which was foreseeable at the time of the parties' original agreement. *Viskase Corp. v. W.R. Grace & Co.*, 1992 U.S. Dist. LEXIS 619, *11 (N.D. Ill. January 23, 1992).

The Stipulated Protective Order was entered in this case on February 11, 2003. At the time that order was negotiated and entered, it must have been known to EM and its counsel that Fitch, Even, Tabin & Flannery ("FET&F"), including Mark W. Hetzler, were attorneys of record for SSC in the PTO. The law firm of FET&F has been patent counsel for SSC since 1999. (Hetzler Decl., ¶15). On June 20, 2000 (two years before this lawsuit commenced), Mr. Hetzler filed a petition to reinstate the '763 patent in suit. (*Id.* at ¶15 and Ex. J thereto). EM had to learn of Mr. Hetzler's and FET&F's dual role, as examination of a patent's prosecution history is universally the first task undertaken when an infringement charge is made (often long before litigation). Since FET&F's role in the PTO was a matter of public record before the initiation of this lawsuit, EM and its counsel had, at very minimum, constructive notice of Mr. Hetzler's role as patent counsel. Accordingly, FET&F's dual role had to be known to EM and its counsel at the time EM stipulated to the current Protective Order.

### A. EM Fails to Meet its Exceptionally High Burden to Justify the Order it Seeks

#### 1. The Relief Sought Would Abrogate SSC's Right to Counsel of Its Choice

EM's requested relief would seriously interfere with SSC's right to choose the counsel of its choice. Courts have long recognized a fundamental due process right to retained counsel in civil proceedings. *See Powell v. Alabama*, 287 U.S. 45, 69 (1932); *see also Indiana v. Haws*, 131 F.3d 1205, 1208 (7th Cir. 1997). Moreover, "the Seventh Circuit considers the right of a party to select counsel of its choice to be a matter of significant importance, which will not be disturbed unless a

6

specifically identifiable impropriety **has occurred**." *Panduit Corp. v. All States Plastic Manuf. Co.*, 744 F.2d 1564, 1576 (Fed. Cir. 1984) (reversing disqualification of defendant's counsel) (emphasis in original). The court in *Panduit* further cautioned against using disqualification as a "prophylactic device" because it is "a drastic measure which courts should hesitate to impose except when **absolutely necessary**." *Id.* at 1577 (emphasis in original); *see also Gullien v. City of Chicago*, 956 F. Supp. 1416, 1421 (N.D. Ill. 1997).

Here, it is quite obvious that EM is attempting to deprive SSC of its chosen counsel. It wants to preclude Mr. Hetzler from prosecuting patents, and Mr. Pipke from effectively working on litigation. EM's has not remotely shown that its requested relief is necessary or that any identifiable impropriety has occurred. EM's requested relief is based on broad speculations and generalizations of harm that are not specific enough to justify the drastic measures it requests.

### 2. Federal Circuit Caselaw Trumps the Cases Cited by EM, and Better Reasoned District Court Cases Reject EM's Theory

The entire premise of EM's motion to further expand its already considerable rights under the existing protective order is that there is a vaguely defined "technology overlap" between the business of EM, SSC and Venture Gain. (Bickford Decl., ¶11). According to EM's theory, this vaguely defined "overlap" fatally infects SSC's outside litigation counsel, such that attorneys engaged in litigation activities cannot properly also provide patent prosecution services to SSC, and Mr. Pipke cannot provide litigation services with access to a complete record. But, EM's premise is not the law, and the few cases cited by EM are neither reflective of the general rule, nor are they applicable here.

To begin with, EM bears the burden to justify any request for a protective order. But, notwithstanding the fact that this case is three years old, and that much written and document discovery has already taken place (and the case is nearing trial), EM fails to point out even one specific document or item of information, the possession of which by Mr. Pipke or Mr. Hetzler is threatening to EM's interests. EM's moving declaration vaguely alludes to "technology overlap," but this falls short of "a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements" necessary to establish good cause for a protective order. *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 102 n.16 (1981) (citation omitted).

Consistent with this generally heavy burden, the Federal Circuit has made plain in patent cases that a competitor is not as a matter of course entitled to a protective order enjoining patent

counsel – *even in-house patent counsel* – from access to confidential information produced by a competitor in litigation. On this subject, EM cites, but totally mischaracterizes, the seminal Federal Circuit case on this subject, the actual holding of which *rejected* EM's arguments here. Specifically, at issue in *U.S. Steel Corp. v. U.S.*, 730 F.2d 1465 (Fed. Cir. 1984), was whether an attorney's status *as in-house counsel* could support the lower court's decision to deny access to confidential information. Although EM's brief suggests that *U.S. Steel* supports its position (EM's Opening Brief, p.10), in fact, the Federal Circuit *reversed* the lower court's decision to restrict attorney access to confidential information. *Id.* at 1469. The Federal Circuit explained:

> The denial of access here rested on the court's stated general assumption that there is "a greater likelihood of inadvertent disclosure by lawyers who were employees committed to remain in the environment of a single company". Denial or grant of access, however, cannot rest on a general assumption that one group of lawyers are more likely or less likely inadvertently to breach their duty under a protective order...Thus the factual circumstances surrounding each individual counsel's activities, associations, and relationship with a party, whether counsel be in-house or retained, must govern any concern for inadvertent or accidental disclosure.

730 F.2d at 1468. The Federal Circuit further reasoned that, due to the "advanced stage" of the litigation, "*forcing plaintiff to rely on newly retained counsel would create an extreme and unnecessary hardship*." *Id.* (emphasis added). Based, in part, on that rationale, the Federal Circuit reversed. Of course, the same circumstance exists here, which EM would have the Court ignore.

Here, contrary to the teaching in *U.S. Steel*, EM offers nothing more than speculation that either Mr. Hetzler or Mr. Pipke is involved in "competitive decisionmaking," and their responsive declarations make entirely clear that they are not. Indeed, *U.S. Steel* allowed access to in-house counsel where the risk of inadvertent disclosure is obviously higher than with outside counsel.

*U.S. Steel* certainly does not stand for the proposition that lawyers assuming the dual role of *outside litigation counsel* and *outside patent counsel* should *per se* be disqualified or barred from access to confidential information, which EM effectively argues. More recent Federal Circuit cases so confirm. In *Matsushita Elec. Indus. Co., Ltd. v. U.S.*, 929 F.2d 1577, 1581 (Fed. Cir. 1991), one of the party's litigation attorneys' also served as its general counsel, senior vice president and secretary. *Id.* at 1579. The lower court restricted that attorney's access to confidential information, but the Federal Circuit reversed and ordered access. *Id.* at 1580. The court reasoned that the term "competitive decisionmaking" does not mean "regular contact with other corporate officials who make policy, or even competitive decisions, but [rather] advice and participation in competitive decisionmaking." EM makes no such showing here.

8

Indeed, in a more recent case essentially identical to this case, the Federal Circuit again rejected arguments like EM's. *See Sibia Neurosciences, Inc. v. Cadus Pharmaceutical Corp.*, 1997 U.S. Dist. LEXIS 24130 (S.D. Ca. 1997), *aff'd sub nom, In re Sibia Neurosciences*, 1997 U.S. App. LEXIS 31828, *1-2. (Fed. Cir. October 22, 1997) (unpublished) (writ of mandamus denied). The Federal Circuit denied plaintiff's petition, citing *U.S. Steel*, because

> denying access to [defendant's] outside counsel on the ground that they also prosecute patents for [defendant] is the type of generalization counseled against in *U.S. Steel*. The facts, not the category, must inform the result.

*Id.* at *7. Significantly, the Federal Circuit noted the lower court's finding that defendant's outside counsel was "very involved in the prosecution of patents," but nevertheless held that "none of the indicia of 'competitive decisionmaking'" was present. *Id.* at *8. Here, no more can be said about Mr. Hetzler or Mr. Pipke, and EM has certainly made no such showing.

While EM has cited some factually distinct district court cases, numerous, better-reasoned district court decisions, including from this District, have adopted the reasoning applied by the Federal Circuit in *In re Sibia*. *See, e.g., AFP Advanced Food Products, LLC v. Snyder's of Hanover Mfg., Inc.*, 2006 U.S. Dist. LEXIS 426 (E.D. Pa. January 6, 2006); *Trading Technologies Int'l, Inc. v. eSpeed, Inc.*, 2004 U.S. Dist. LEXIS 19429 (N.D. Ill. September 23, 2004); *Medimmune, Inc. v. Centocor, Inc.*, 271 F.Supp. 2d 762 (D. Md. 2003).

In *Trading Technologies*, this Court refused to deny plaintiff's trial attorney access to confidential information even though he had also been involved in patent prosecution for plaintiff. 2004 U.S. Dist. LEXIS at *1-2. When faced with the conflicting case law, the court adopted the Federal Circuit's argument in *In re Sibia*, concluding that the risk of inadvertent misuse of confidential material was not great enough to justify the outright denial of access. *Id.*

Just last month, in *AFP*, the court denied the defendant's motion for a protective order which would not permit plaintiff's trial attorney to prosecute patent applications for plaintiff. 2006 U.S. Dist. LEXIS at *7. The court, in denying the motion stated,

> ...the threat, standing alone...is not enough to justify a protective order barring [plaintiff's] attorneys from prosecuting similar patents for two years. As further explained in *U.S. Steel*, the decision to deny access to discovered materials shall be done on a case-by-case, and lawyer-by-lawyer basis. In this case, there is no reason for the court to believe that [plaintiff's] attorneys will not strictly follow the adopted order and refrain from using, either inadvertently or intentionally, Confidential Attorney's Eyes Only information for the sole purpose of this litigation. ***Barring [plaintiff's] attorneys from prosecuting similar patents for two years following this suit, without some tangible reason or good cause other than the general threat of***

9

> ***inadvertent misuse of discovered materials, is the exact type of overly broad and generalized fear rejected in...U.S. Steel and In re Sibia...***

*Id.* at *6-7 (emphasis added).

In *MedImmune*, the court discussed, at length, the precise argument invoked by EM's motion to modify the stipulated protective order. 271 F.Supp. 2d at 773-775. As here, the issue was whether plaintiff's outside litigation counsel should be denied access to highly-confidential materials, based on his dual role as a patent prosecutor for plaintiff. *Id.* at 773. The defendants in *MedImmune* argued that plaintiff's attorney was a "competitive decisionmaker" and, therefore, should either be denied access to the confidential material or should refrain from prosecuting patents on the same subject matter. *Id.* The court rejected defendant's arguments because they, "...would lead to the conclusion that *no* attorney, whether in house or retained, could prosecute patents for a client while still working as litigation counsel for that client." *Id.* (emphasis in original).

The *MedImmune* court also expressly explained the flaws in the reasoning of EM's primary case, *Interactive Coupon Marketing Corp. v. H.O.T.! Coupons LLC*, 1999 U.S. Dist. LEXIS 12437:

> The Court disagrees with the reasoning applied in *Interactive* because, in the Court's view, it amounts to a *per se* prohibition on patent counsel. If "shaping" patent applications amounts to competitive decision-making, the Court has trouble imagining a patent prosecutor who would not meet that standard. In any event, here there has been no showing that [plaintiff's counsel of record] does anymore than bring the patents before the Patent Office. There has been no showing that he actively participates in [defendant's] internal decision-making process *vis a vis* its competitors.

*MedImmune*, 271 F.Supp.2d at 774 n.13 (emphasis in original). The court further reasoned that denying access would work a hardship on plaintiff because its attorney has had a long-standing relationship with plaintiff, citing *Sibia*. *Id.* at 774-775.

EM cites no Federal Circuit case adopting the position that EM asserts in its motion, or approving the district court cases which EM cites. The holdings of the Federal Circuit in *U.S. Steel, Matsushita*, and *In re Sibia* all are to the contrary, as are the District Court holdings in *Trading Technologies, AFP, MedImmune* and *Sibia* (which was affirmed by the Federal Circuit).

EM has the burden of showing that "good cause exists" for issuance of its proposed modifications. *See Jepson, Inc. v. Makita*, 30 F.3d 854, 858 (7th Cir. 1994). EM has plainly failed in its burden to show that there is any risk of inadvertent disclosure by Messrs. Hetzler or Pipke. EM has further failed to establish that Messrs. Hetzler and Pipke are involved in "competitive decisionmaking" as defined by the Federal Circuit. Mere generalizations and Mr. Bickford's

10

speculation regarding Messrs. Hetzler and Pipke's roles cannot support the relief EM seeks.

Finally, even the cases cited by EM counsel that a key factor to consider in determining the propriety of a requested protective order provision is the prejudice which would be caused if counsel is disqualified or restricted in some manner. *See e.g.*, *Motorola, Inc. v. Interdigital Tech. Corp.*, 1994 U.S. Dist. LEXIS 20714, *15 (D. Del. December 19, 1994). EM's motion ignores this factor.

On the subject of prejudice, the situation here would be completely different if EM had sought a ban on patent prosecutors three years ago, when it stipulated to the Protective Order presently in place. However, EM plainly agreed long ago (i.e., three years) not to ban patent prosecutors by stipulating to the protective order it did. Moreover, Mr. Hetzler (since the inception of the case in 2002) and Mr. Pipke (since June 1, 2005) have been heavily involved in discovery, and more recently in expert disclosures, which have proceeded in accordance with a scheduling order entered by this court long ago. Under these circumstances, it is simply unfair for EM to have "laid in the weeds" on this subject – indeed, waiting four months after its own announced "drop dead" date of September 2, 2005 – before making this motion. EM would now force these two attorneys to either discontinue work on litigation in which they have been heavily involved, or to discontinue work on patent prosecution matters they have been handling. This would create unfair hardship, both for the attorneys and their client. *Motorola* at *15. Because EM created this hardship through its own inexcusable delay, its motion should be denied for that reason alone.

**B.     EM Is Barred by the Equitable Doctrines of Laches, Waiver and Estoppel from Raising its Present Objections to the Stipulated Protective Order**

Based on the correspondence between counsel for SSC and EM attached to the Hetzler Declaration, it is plain that EM should be equitably barred from making its motion to modify the stipulated protective order as it relates to Mr. Pipke. EM, through its attorneys, affirmatively represented in writing that it would seek relief from this Court "no later than September 2, 2005." (Hetzler Decl., ¶11 and Ex. H thereto). Although it was under no obligation to do so, SSC waited a full six weeks beyond EM's stated deadline before concluding that EM had conceded the issue, and reasonably proceeded accordingly. Stated plainly, SSC relied on the written representations of EM's attorneys. Due to EM's unexplained and unjustified delay in seeking such relief and the severe prejudice to SSC which would result if this motion were granted, the equitable doctrines of laches, estoppel, and waiver prevent EM from obtaining such relief.

Laches is an equitable doctrine concerned with a party's neglect or omission to assert a right

11

which, taken in conjunction with a lapse of time and circumstances causing prejudice to the opposite party, will operate as a bar to assert such right. *Alexian Bros. Health Providers Assoc., Inc. v. Humana Health Plan, Inc.*, 330 F.Supp.2d 970, 977 (N.D. Ill. 2004). The doctrine of laches requires a showing (1) that the opponent failed to assert a right with reasonable diligence despite having actual or constructive knowledge of the right and (2) that the party asserting the defense suffered prejudice from the delay. *Id.*

Equitable estoppel prevents a litigant from repudiating a representation that has reasonably and foreseeably induced reliance by the party to whom it was made. *DeVito v. Chicago Park District*, 270 F.3d 532, 534-535 (7th Cir. 2001). "Estoppel is appropriate against a party who adopts a position which reasonably misleads someone into detrimental reliance, regardless of the intent of its actions, if to hold otherwise would have an unjust effect." *TIC United Corp. v. Lisowski*, 1994 U.S. Dist. LEXIS 14765, *21-22 (N.D. Ill. Oct. 17, 1994) (citation omitted). Moreover, "[i]t is the duty of a person having a right, and seeing another about to commit an act infringing upon it, to assert his right...He cannot by his silence induce or encourage the commission of the act and then be heard to complain." *Id.*

Waiver is the voluntary intentional relinquishment of a known right, claim, or privilege. *Horbach v. Kaczmarek*, 915 F.Supp. 18, 23 (N.D. Ill. 1996). Waiver may arise either expressly or from conduct inconsistent with an intent to enforce that right. Illinois courts have held that delays like the one present in this case constitute an effective waiver of a party's objection to an alleged conflict of interest. *See First Nat'l Bank v. St. Charles Nat'l Bank*, 504 N.E.2d 1257, 1264 (Ill. App. Ct. 1987) (finding that a failure to raise the issue of disqualification at an earlier time effectively waives the right to object to counsel on conflict of interest grounds); *Tanner v. Board of Trustees*, 121 Ill. App. 3d 139, 146-147, 459 N.E.2d 324 (1984) (nine month delay), *In re Possession and Control of the Commissioner of Banks and Real Estate of Independent Trust Corp.*, 327 Ill.App.3d 441, 764 N.E.2d 66 (2001) (seven month delay).

Each of these equitable doctrines should be applied to bar the discretionary relief EM now requests. As discussed above, and explained in the accompanying Hetzler Declaration, from May 31, 2005 through August 25, 2005, the parties debated Mr. Pipke's and Mr. Hetzler's respective roles. However, these efforts ended in August 2005, and the issues were not raised again until now. Specifically, on August 19, 2005, Mr. Hetzler advised Mr. Pettinari that,

> [SmartSignal intends] to provide access to the protected information [to Mr. Pipke].

> However, we will refrain from doing to so for five business days so that EM can file a motion with the court seeking modification of the Protective Order. We, however, will vigorously oppose any such motion.

(*Id.* at ¶10 and Ex. G thereto). In response, Mr. Pettinari advised Mr. Hetzler, on August 23, 2005, as follows,

> ...we do intend to seek protection from the Court regarding your intention to provide Mr. Pipke with access to confidential and proprietary documents and information produced to SmartSignal's counsel in this litigation. However, we strenuously object to your unilateral dictating when that motion must be filed. ***We expect to file this motion no later than Friday, September 2, 2005***...

(*Id.* at ¶11 and Ex. H thereto (emphasis added)).

SSC forthrightly complied with EM's request to delay Mr. Pipke's work until after September 2, 2005, but EM never filed its threatened motion. Indeed, EM slept upon its right and failed to raise these issues again until this motion was filed, four months later, on January 3, 2006. The credibility of EM's objection to Messrs. Pipke and Hetzler's access to confidential information is destroyed by its own delay.

Quite obviously from the record, SSC relied on EM's assertion that it would file its threatened motion by September 2, 2005. When it did not do so, SSC relied on EM's inaction and continued to prepare for trial in accordance with the Court's scheduling order, abiding by the restrictions of the stipulated protective order that was entered in this case in February 2003. But not until mid-October 2005, did Mr. Pipke begin reviewing all of EM's documents. (*Id.* at ¶13-14 and Pipke Decl., ¶16). SSC had no alternative, in light of the Court's pre-trial deadlines, namely the original expert report due date of December 20, 2005 (two weeks before EM filed its motion). Messrs. Hetzler and Pipke expended large amounts of time reviewing documents and familiarizing themselves with the extremely technical subject matter of the '763 patent, and working with SSC's technical expert so that it could submit its expert report on time. SSC met the Court's deadline.

Needless to say, SSC has invested a very large amount of litigation expenses so that Messrs. Pipke and Hetzler could acquire the technical knowledge required to enforce the '763 patent and prepare this case for trial. SSC would be severely prejudiced if it had to start over and train new attorneys in the highly technical and complicated subject matter of the '763 patent. *(See* Hetzler Decl., ¶16). This harm to SSC cannot be justified by EM's neglect and inaction. Accordingly, EM should be barred from bringing its motion by the doctrines of laches, estoppel and waiver.

13

**V.     THE VENTURE GAIN RED HERRING**

Although the foregoing analysis provides more than adequate reason to deny EM's motion, for completeness of record, we wish to briefly address EM's specious arguments related to Venture Gain.  EM has concocted a totally spurious claim that EM is competitive with Venture Gain.  It is not a stretch to analogize EM's argument to an argument that General Motors and Medtronic are "competitors" because they both use computers and software in their business.  EM's argument is equally absurd.

The paper record shows that, historically, EM's business has focused exclusively on industrial equipment monitoring.  Indeed, EM's license to the certain technology from ANL is limited solely to electric power generation and distribution.  EM has been funded with a stream of small business grants from the federal government.  The complete list of grants funded to EM shows they ***all relate to equipment health monitoring*** in the area of industrial equipment (*e.g.,* turbine engine) monitoring.[2]  More specifically, since acquiring its limited license to certain technology from ANL in 2001, EM has been fully occupied with sensor calibration and equipment monitoring studies with the Electric Power Research Institute ("EPRI").  (*Id.* at ¶14 and Ex.B thereto).  These studies are exclusively focused on nuclear power plant equipment.  In its own presentation to EPRI, EM described itself as "[s]pecializing in advanced diagnostic software and systems for automated surveillance and control of *power, aerospace, and industrial equipment*."  (*Id.* at ¶15 and Ex. C thereto) (emphasis added).  ***Indeed, because SSC has an exclusive license from ANL to use the same technology in all fields of use besides electric power generation and distribution; EM can have, at most, a license in the field of electric power generation and distribution.***  Venture Gain is not remotely involved in that field.

Regarding the alleged "overlap" of technology, EM asserts through Mr. Bickford's conclusory and self-serving declaration that it is allegedly developing applications for its technologies in the infrastructure security information management and medical fields.  But Mr.

---

[2] 
(1) "Real-Time Turbine Engine Diagnostic System" – Department of Defense, 2001,
(2) "Autonomous Hydrogen Leak Detection and Control System" - NASA, 1997.
(3) "Real-Time Propulsion Diagnostic System Designer" - NASA, 1997.
(4) "System State Determination for Real-Time Sensor Validation" - NASA, 1999.
(5) "Real-Time Space Shuttle Main Engine Sensor Validation" - NASA, 1995.
(6) "Multivariate State Estimation Technique (MSET) Modeling for Assured Measurement Integrity" – Department of Energy, 2001.

(Pipke Decl., ¶13 and Ex. A thereto).

14

Bickford's broad generalities are not corroborated by any documentary evidence which would support the idea that these alleged developments are anything more than ideas conjured up for purposes of this motion.

Venture Gain's current and future business activities *remain solely in the area of life sciences*. (Pipke Decl., ¶8). EM indisputably has done nothing in that market segment, and has failed to corroborate any alleged development work in that area. Venture Gain, in contrast, has documented its limited scope of interest, specifically licensed the SBM technology from SSC *only* for use in applications in the field of life sciences. (*Id.* at ¶7). Venture Gain's business is directed *outside* of the equipment monitoring markets, *precisely to avoid being competitive with SSC* (and, concomitantly, with EM).

The prejudice to SSC should the Court grant EM's motion is unwarranted. Mr. Pipke is particularly valuable to SSC as litigation counsel because he uniquely and intimately understands the technology at issue.[3] To deprive SSC of Mr. Pipke's expertise, especially in light of EM's delay, would be inequitable and highly prejudicial.

## VI. CONCLUSION

For the foregoing reasons, SSC respectfully requests that this Court deny EM's Motion to Modify the Stipulated Protective Order in its entirety.

Dated: February 10, 2006

/s/ Christine A. Abuel
Steven C. Schroer
Christine A. Abuel
Fitch, Even, Tabin & Flannery
120 South LaSalle Street, Suite 1600
Chicago, Illinois 60603
Telephone: (312) 577-7000
Facsimile: (312) 577-7007

---

[3] EM also claims that Mr. Pipke's status as an inventor on two issued patents and six patent applications for SSC somehow warrants the delayed relief it seeks. Mr. Pipke's being named as an inventor of certain SSC patents was merely a conseequence of his former employment with SSC. His employment with SSC, more than a year ago, terminated, and his patent rights were all assigned to SSC. Thus, this argument asserted by EM is another red herring.

15

## CERTIFICATE OF SERVICE

I, Christine A. Abuel, hereby certify that on February 10, 2006, a copy of the foregoing **SMARTSIGNAL'S RESPONSE BRIEF IN OPPOSITION TO EXPERT MICROSYSTEMS' MOTION TO MODIFY THE STIPULATED PROTECTIVE ORDER** was filed electronically using the CM/ECF system and caused to be served by the methods indicated below. Notice of this filing will be sent to the following parties by operation of the Court's CM/ECF system. Parties may access this filing through the Court's system.

*Parties receiving service electronically and U.S. Mail are as follows*:

Keith P. Schoeneberger – kschoeneberger@llgm.com
LEBOEUF, LAMB, GREENE & MACRAE, LLP
Two Prudential Plaza
180 North Stetson, Suite 1175
Chicago, Illinois 60601

(COUNSEL FOR DEFENDANT, EXPERT MICROSYSTEMS, INC.)

*Parties receiving service via U.S. Mail are as follows*:

Mark L. Pettinari
LAW OFFICES OF MARK L. PETTINARI
Stock Exchange Tower
155 Sansome Street, Suite 400
San Francisco, CA 94104

(COUNSEL FOR DEFENDANT, EXPERT MICROSYSTEMS, INC.)

   s/ Christine A. Abuel
Christine A. Abuel, cabuel@fitcheven.com,
*Attorney for Plaintiff, SmartSignal Corporation*