IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SMARTSIGNAL CORPORATION, a Delaware Corporation, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 02 C 7682 |
| v. | ) ) | Judge Virginia M. Kendall |
| EXPERT MICROSYSTEMS, INC., a California Corporation, | ) ) ) | Magistrate Judge Martin C. Ashman |
| Defendant. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Defendant, Expert Microsystems, Inc., moves this Court to modify the stipulated protective order that Defendant and Plaintiff, SmartSignal Corp., previously agreed to in February 2003. This matter comes before this Court pursuant to 28 U.S.C. § 636(b)(1)(A) and Local Rule 72.1. For the reasons that follow, Defendant's motion is denied.

### I. Background

#### A. Parties

Defendant is in the business of providing software and systems for monitoring and controlling performance critical assets and related consulting services. Plaintiff is a company that provides methods and systems for monitoring and controlling equipment and systems, as well as related consulting services, and is a competitor to Defendant. The case at bar involves claims of patent infringement based on Defendant's use of the multivariate state estimation technique ("MSET") technology. (Def.'s Br., Bickford Decl., ¶¶ 4-6.)

Venture Gain LLC is a small start-up company that focuses exclusively on the life science market. Venture Gain is a licensee of Plaintiff in the life science field. While there is no overlapping ownership, employees, or customers between Venture Gain and Plaintiff, Plaintiff's former CEO is now Venture Gain's CEO, Plaintiff's former Chief Scientist is now Venture Gain's Chief Scientist, and Mr. R. Matthew Pipke, Plaintiff's former Vice President of Technology, is now Venture Gain's Chief Technology Officer. Pipke is also a named inventor on several patents and applications assigned to Plaintiff. (Pl.'s Resp., Pipke Decl., ¶¶ 6-7, 10-12.)

Mr. Mark Hetzler works at the law firm Fitch, Even, Tabin & Flannery ("FET&F") and represents Plaintiff in litigation against Defendant, including in the instant case, while simultaneously acting as patent prosecution counsel to Plaintiff for patent applications that involve technology similar to the technology at issue in this case. (Def.'s Br. at 9; Pl.'s Resp., Hetzler Decl., ¶¶ 2, 15.)

### B. Procedural Background

Plaintiff brought this action on October 25, 2002, against Defendant for infringement of U.S. Patent No. 4,937,763 ("the '763 patent"). At the outset of litigation, on February 11, 2003, the parties entered into a stipulated protective order which simply stated that all confidential information designated under the protective order shall be used only for the purpose of preparing for and conducting this action (including appeals) and not for any business, research, development, or other purpose whatsoever. (Stipulated Protective Order, Docket Nos. 14-15.) The parties engaged in discovery until this case was stayed on August 15, 2003, due to

Defendant's request for reexamination of the '763 patent. (Docket No. 19.) On January 27, 2005, this action was reinstated and the stay was lifted. (Docket No. 20.)

On January 3, 2006, Defendant moved this Court to modify the stipulated protective order in order to prohibit Pipke from access to confidential information produced by Defendant and to prohibit any attorney, including Hetzler, representing Plaintiff and having access to confidential information produced by Defendant from continuing to prosecute patent applications on behalf of Plaintiff or Venture Gain for the duration of this litigation, including all appeal periods, and for two years thereafter. (Def.'s Br. at 2.) Defendant argues that modification of the stipulated protective order is appropriate because Pipke and Hetzler are competitive decision-makers for Plaintiff, as (1) Pipke was Plaintiff's Vice President of Technology, is a named inventor on Plaintiff's patents, and is currently the Chief Technology Officer for Venture Gain, and (2) Hetzler prosecutes patent applications for Plaintiff, including those wherein Pipke is a named inventor. (Def.'s Br. at 11.) According to Defendant, unless the stipulated protective order is modified, disclosure during discovery of confidential information will be prejudicial to Defendant.

## II. Discussion

### A. Modification Requires Good Cause.

Under Rule 26(c) of the Federal Rules of Civil Procedure, a court may enter a protective order for good cause shown to protect a party from annoyance, oppression, undue burden or expense. Fed. R. Civ. P. 26(c). Just as good cause is required to enter a protective order, good cause is required to modify a protective order. *Murata Mfg. Co. v. Bel Fuse, Inc.*, 234 F.R.D.

175, 179 (N.D. Ill. 2006). It is the burden of the party seeking to modify the protective order to demonstrate good cause. *Id.* This burden is especially high where a protective order is agreed to by the parties before its presentation to the court. *Am. Tel. & Tel. Co. v. Grady*, 594 F.2d 594, 597 (7th Cir. 1978). When deciding whether to modify a protective order, courts consider the nature of the protective order, foreseeability at the time of issuance of the modification requested, parties' reliance on the order, and whether good cause exists for the modification. *Murata Mfg. Co.*, 234 F.R.D. at 179.

In this case, the parties entered into a blanket protective order, which permits the parties to protect selected documents that they believe in good faith contain trade secrets and confidential commercial information. *Id.* Blanket protective orders are routinely entered into by parties in commercial litigation, especially in cases between competitors. Such orders are more difficult to modify when the parties have stipulated to them, *Am. Tel. & Tel. Co.*, 594 F.2d at 597, especially where the proposed modification relates to a matter that was foreseeable at the time of the parties' original agreement. *Murata Mfg. Co.*, 234 F.R.D. at 180; *Viskase Corp. v. W.R. Grace & Co.*, No. 90 C 7515, 1992 WL 13679, at *4 (N.D. Ill. Jan. 24, 1992.) It follows that Defendant must make a strong showing of good cause before this Court will modify the stipulated protective order. The Court also notes that, in this case, Defendant's proposed modification would ultimately deny Plaintiff the counsel of its choosing, which is disfavored in our judicial system and requires a strong showing in and of itself. *Cummins-Allison Corp. v. Glory Ltd.*, No. 02 C 7008, 2003 U.S. Dist. LEXIS 23653, at *29-30 (N.D. Ill. Jan. 2, 2004) citing *Owen v. Wangerin*, 985 F.2d 312, 317 (7th Cir. 1993).

### B. Defendant's Motion is Untimely.

As an initial matter, the Court finds that Defendant's motion is untimely as (1) Defendant knew of Hetzler and FET&F's involvement with the underlying patent in this case as early as June 2000 but failed to raise the issue before stipulating to the protective order and then waited another three years to object, and (2) despite the fact that Defendant knew of Plaintiff's intention to go forward with Pipke as counsel, Defendant unreasonably waited several months before filing its motion. It follows that the doctrines of laches, equitable estoppel, and waiver operate to bar Defendant's motion.

#### 1. Hetzler and FET&F

Defendant had actual knowledge of Hetzler's role as patent attorney for Plaintiff as early as June 2000. Hetzler's law firm, FET&F, has counseled Plaintiff in its patent matters since 1999. (Pl.'s Sur-Reply, Hetzler Decl., ¶ 4.) On June 20, 2000, Hetzler filed a Petition to Accent Unintentionally Delayed Payment of Maintenance Fee with the U.S. Patent and Trademark Office on behalf of Plaintiff to reinstate the '763 patent. (Id., Ex. A.) This petition is a matter of public record, see 37 C.F.R. § 1.11, and lists both Hetzler and FET&F as the "payor" on its face. (Pl.'s Sur-Reply, Hetzler Decl., Ex. A.) Defendant had possession of this petition, as well as the accompanying letter that Hetzler submitted with the petition, prior to executing the stipulated protective order on February 5, 2003. (Id. ¶ 7.) The letter that Hetzler submitted with the petition was entitled "Petition to Accept Unintentionally Delayed Payment of Maintenance Fee (27 C.F.R. § 1.378(c))" and in it Hetzler explained that "delay in paying the maintenance fee for this patent was unintentional." (Id., Ex. A, EM 0114-0115.) Significantly, Defendant directly

referenced Hetzler's petition and letter in its first set of interrogatories (sent to Mr. Hetzler) on January 24, 2003. (Id., Ex. B.) Interrogatory No. 29 of Defendant's first set of interrogatories reads: "State all facts that support the statement that the delay in paying the second maintenance fee for the '763 patent was 'unintentional,' within the meaning of 37 C.F.R. 1.137(b) and 1.378(c)." (Id.)

Defendant also had knowledge of FET&F's patent prosecution work for Plaintiff with regards to at least seven other patents filed in 2001 and 2002, in which the named inventor appoints "the practitioners associated with [the FET&F] Customer Number 22242 with full power of attorney" and requests that all correspondence be sent to FET&F. (Id., Ex. E.) While Defendant suggests that the public record for these patents only referenced attorney Perry J. Hoffman of the law firm Michael Best & Friedrich LLP, (Def.'s Reply at 5-7), Hoffman worked for FET&F until 2002 and, in February 2003, public records still listed FET&F (including Hetzler) as having powers of attorney on Plaintiff's prosecution files. (Pl.'s Sur-Reply, Hetzler Decl., ¶ 11.) In short, the public record is replete with evidence of FET&F's work on behalf of Plaintiff well before the parties executed the stipulated protective order. Thus, Hetzler and FET&F's involvement in this case had been foreseeable for some time when the parties entered into the February 2003 stipulated protective order.

### 2. Pipke

Defendant learned of Pipke's role in June 2005, yet chose not to act until January 2006. On May 31, 2005, Hetzler, in his capacity as litigation counsel for Plaintiff, advised counsel for Defendant that Pipke was no longer employed as Plaintiff's Vice President of Technology but had

rejoined FET&F on January 1, 2005, and would be filing an appearance in this action to serve as Plaintiff's outside counsel. (Pl.'s Resp., Hetzler Decl., ¶ 4 and Ex. A.) Pipke filed his appearance on June 1, 2005. (Docket No. 27.) Counsel for Defendant expressed concerns regarding a potential conflict due to Pipke's dual roles as a shareholder of Plaintiff and outside counsel for Plaintiff. Plaintiff agreed to deny Pipke access to Defendant's documents designated "confidential - attorneys' eyes only" in order to allow Defendant to follow up on its concerns. (Pl.'s Resp., Hetzler Decl., ¶ 5 and Ex. B.) On July 19, 2005, Hetzler informed Counsel for Defendant that, after investigating the issue, he saw no reason to restrict Pipke's access to "confidential - attorneys' eyes only" documents. (Id. ¶ 6 and Ex. C.) Counsel for Defendant reiterated her objections to Pipke's access to documents and raised Pipke's position with Venture Gain as an additional reason for barring him access to confidential materials. (Id. ¶ 7 and Ex. D.) In a July 22, 2005 letter, Hetzler argued that there was no competition between Venture Gain and Defendant. (Id. ¶ 8 and Ex. E.)

Defendant hired new counsel in August 2005, (Docket No. 30), but the dispute over Pipke's participation continued. A letter sent by Plaintiff on August 19, 2005, made clear that, unless Defendant filed a motion to modify the protective order, Plaintiff intended to grant Pipke access to confidential materials beginning on August 24, 2005. (Id. ¶ 10 and Ex. G.) Defendant responded on August 23, 2005, with a letter objecting to Pipke's access to confidential materials, as well as Hetzler's role in prosecuting patent applications for Plaintiff. (Id., Ex. H.) The

August 23, 2005 letter also questioned why FET&F should not be disqualified from representing Plaintiff and stated:

> Please provide us with your response no later than the close of business on Monday, August 29, 2005, so that we may consider your position before filing a motion to disqualify with the Court. As noted above, we intend to seek protection from the Court regarding your intention to provide Mr. Pipke with access to confidential and proprietary documents and information produced to SmartSignal's counsel in this litigation. However, we strenuously object to your unilateral dictating when the motion must be filed. We expect to file this motion no later than Friday, September 2, 2005 . . . .

(Id.) On August 25, 2005, Plaintiff's counsel responded to the August 23, 2005 letter, dismissing Defendant's objections and restating Plaintiff's intention of going forward with Pipke and Hetzler as their litigation counsel in this matter. (Id. ¶ 12 and Ex. I.)

Defendant did not file a motion on September 2, 2005. Plaintiff waited six weeks and then, beginning on October 13, 2005, moved forward with Pipke as its counsel. (Id. ¶ 14.) Several months later, on January 3, 2006, Defendant moved this Court to modify the stipulated protective order to prevent Pipke from accessing Defendant's confidential information.[1]

### 3. Laches, Estoppel, and Waiver Bar Modification

The doctrines of laches, equitable estoppel and waiver weigh heavily against granting Defendant's motion. "Laches addresses delay in the pursuit of a right when a party must assert

---

[1] Defendant suggests that it filed this same motion on December 12, 2005, when it raised similar complaints about the involvement of Pipke and Hetzler in a separate lawsuit between Plaintiff and Defendant's President, Randall L. Bickford. The Court is not persuaded by motions filed in other cases, as (1) those motions are not before this Court, (2) there are differences between the two cases, and (3) Defendant's objection to Pipke and Hetzler in a separate case does not necessarily mean that Defendant objects to their participation in the case at bar. The Court does note, however, that December 12, 2005, is still several months after September 2, 2005, and only a few weeks before January 3, 2006.

that right in order to benefit from it." *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 820 (7th Cir. 1999). For laches to apply, Plaintiff must show that Defendant demonstrated an unreasonable lack of diligence by not filing its motion sooner and that Plaintiff was prejudiced as a result. *Id.*; *Helene Curtis Indus., Inc. v. Church & Dwight Co.*, 560 F.2d 1325, 1334 (7th Cir. 1977) cert den., 434 U.S. 1070 (1978). To establish equitable estoppel Plaintiff must show that Defendant made misrepresentations upon which Plaintiff relied to its detriment. *Lewis v. Washington*, 300 F.3d 829, 834 (7th Cir. 2002). Finally, waiver occurs when a defendant manifests an intention or expressly declines to assert a right. *United States v. Woods*, 301 F.3d 556, 560 (7th Cir. 2002). Delay may constitute an effective waiver of a party's objection to an alleged conflict of interest. *See First Nat'l Bank of Elgin v. St. Charles Nat'l Bank*, 504 N.E.2d 1257, 1264 (Ill. App. Ct. 1987); *Tanner v. Bd. of Trs. of Univ. of Illinois*, 459 N.E.2d 324, 329 (Ill. App. Ct. 1984), appeal denied.

In this case, Defendant knew about Hetzler's patent work for years and Pipke's role as outside counsel for six months before filings its motion. Because Plaintiff reasonably interpreted Defendant's decision not to act as acquiescing to Hetzler and Pipke's participation in this case, and because Plaintiff relied heavily on Hetzler and Pipke to prepare its case over the last several months and years, laches applies. Similarly, given the clear and unequivocal disagreement between Defendant and Plaintiff regarding the appropriateness of Pipke's representation, Defendant's failure to act on its threat to file a motion "no later than Friday, September 2, 2005" could reasonably be interpreted by Plaintiff as a decision to drop its objections and reluctantly permit Pipke to participate in this case. Plaintiff relied on that representation when it began educating and relying upon Pipke in October 2005 and, under the principles of equitable

estoppel, it is too late for Defendant to object now. Finally, Defendant's three-year delay in objecting to Hetzler and its six-month delay in objecting to Pipke constitutes waiver of its conflict of interest argument. *See In re Possession and Control of the Comm'r of Banks and Real Estate of Indep. Trust Corp.*, 764 N.E.2d 66, 99-100 (Ill. App. Ct. 2001) (finding objection to attorney conflict waived after seven-month delay); *First Nat'l Bank of Elgin*, 504 N.E.2d at 1264 (finding objection to attorney conflict waived after fifteen-month delay); *Tanner*, 459 N.E.2d at 329 (finding objection to attorney conflict waived after nine-month delay). *Compare to Cummins-Allison Corp.*, 2003 U.S. Dist. LEXIS 23653, at *12-13 (The court would be more receptive to waiver argument if movant had waited one year, and not just a few weeks, before filing motion to modify stipulated protective order.).

Plaintiff relied on Defendant's lack of action to its detriment. Since February 2003 and October 2005, respectively, Plaintiff has invested time and money so that Hetzler and Pipke could acquire the technical knowledge required to enforce the '763 patent and prepare this case for trial and Plaintiff would be prejudiced if it had to start over and train new attorneys at this time. For these reasons, Defendant waited too long to file its motion to modify the stipulated protective order.

### C. Even If Defendant's Motion Was Not Time Barred, Defendant Fails to Establish Good Cause For Modifying the Protective Order.

Defendant argues that good cause exists to modify the stipulated protective order because in February 2003 it was unforeseeable that Plaintiff would hire two competitive decision-makers

as outside counsel. Plaintiff argues that neither Hetzler, nor Pipke, is a competitive decision-maker in this case.

When evaluating whether an attorney should have access to confidential materials, a court should balance the risk of inadvertent disclosure of trade secrets to competitors against the risk of impairing the process of litigation by denying access. *Interactive Coupon Mktg. Group, Inc. v. H.O.T.! Coupons, LLC*, No. 98 C 7408, 1999 WL 618969, at *2 (N.D. Ill. Aug. 9, 1999) (internal quotations omitted). Risk of inadvertent disclosure of trade secrets exists where the factual circumstances show that an attorney acts as a competitive decision-maker. *U.S. Steel Corp. v. United States*, 730 F.2d 1465, 1468 (Fed. Cir. 1984). Competitive decision-making refers to an attorney's activities, association, and relationship with a client that are such as to involve attorney's advice and participation in any or all of the client's decisions (pricing, product design, etc.) made in light of similar or corresponding information about a competitor. *Id. See also Matsushita Elec. Indus. Co., Ltd. v. United States*, 929 F.2d 1577, 1580 (Fed. Cir. 1991) (The standard is not regular contact with other corporate officials who make policy or even competitive decisions.). Because a factual inquiry is required, the denial or grant of access cannot rest on a general assumption that one group of lawyers is more likely or less likely to inadvertently breach its duty under a protective order. *U.S. Steel*, 730 F.2d at 1468. Rather, the decision to deny access to discovered materials shall be done on a case-by-case and lawyer-by-lawyer basis. *AFP Advanced Food Prods. LLC v. Snyder's of Hanover Mfg., Inc.*, No. 05 C 3006, 2006 WL 47374, at *2 (E.D. Pa. Jan. 6, 2006).

1.  Hetzler and FET&F

Defendant argues that Hetzler and his firm FET&F should be denied access to confidential materials because Hetzler acts as patent prosecution counsel to Plaintiff for patent applications involving technology similar to the confidential information disclosed by Defendant in this case. (Def.'s Br. at 8-9.)[2] In making this argument, Defendant relies on a few lower court decisions that denied access to patent attorneys based on the assumption that patent attorneys exposed to competitor's confidential information will have to constantly challenge the origin of every idea and every spark of genius when shaping a patent application, and will inevitably disclose confidential information at some point. *Interactive Coupon*, 1999 WL 618969, at *3; *Motorola, Inc. v. Interdigital Tech. Corp.*, No. 03-488-LON, 1994 U.S. Dist. LEXIS 20714, at *15 (D. Del. Dec. 19, 1994). *See also Cummins-Allison Corp.*, 2003 U.S. Dist. LEXIS 23653, at *23-27 (supporting these arguments but finding that they did not operate to bar attorneys at issue from receiving confidential information). These courts conclude that the level of introspection required to avoid inadvertent disclosure is simply too much to expect, no matter how intelligent, dedicated, or ethical the patent attorneys may be. *Motorola, Inc.*, 1994 U.S. Dist. LEXIS 20714, at *15. *See also Cummins-Allison Corp.*, 2003 U.S. Dist. LEXIS 23653, at *22-24.

---

[2] Defendant claims that it has done extensive research into prediction model methods of many types and holds trade secret technology and know-how into their formulation, calibration, and use that would be valuable and directly applicable to improving the prediction model methods used by Plaintiff and Venture Gain. Furthermore, Defendant claims to have an extensive body of related technology that enables the most effective use of prediction model technology for monitoring and controlling equipment and systems--a core business of Plaintiff--and also claims to be developing applications for its technologies in the infrastructure security information management and medical fields that overlap the business interests of Venture Gain. (Def.'s Br. at 7-8.)

Defendant's argument and case law in effect advocate a per se rule that denies patent attorneys access to confidential information and is inconsistent with Federal Circuit precedent. Despite the concerns raised in Defendant's cases, the Federal Circuit clearly requires an individualized factual showing of competitive decision-making before denying access to an attorney. *U.S. Steel*, 730 F.2d at 1468. *See also In re Sibia Neurosciences, Inc.*, Docket No. 525, 1997 U.S. App. Lexis 31828, at *7-9 (Fed. Cir. Oct. 22, 1997) (unpublished). In *In re Sibia*, an unpublished case but one that offers valuable insight into the Federal Circuit's application of competitive decision-making to patent prosecution, the defendant's outside counsel represented the defendant in patent prosecution work and had represented more than fifty clients on biotechnology matters, including the area involved in the underlying action. *Id.* at *7. Nevertheless, the Federal Circuit held that "denying access to [the defendant's] outside counsel on the ground that they also prosecute patents for [the defendant] is the type of generalization counseled against in U.S. Steel. The facts, not the category, must inform the result." *Id.* The *In re Sibia* Court then reiterated that, under *U.S. Steel*, each case must be decided based on the specific facts involved therein. *Id. See also Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, No. 04 C 5312, 2004 WL 2534389, at *1 (N.D. Ill. Sept. 24, 2004) (rejecting per se rule denying access to patent attorneys based on *U.S. Steel* and *In re Sibia*); *MedImmune, Inc. v. Centocor, Inc.*, 271 F. Supp. 2d 762, 774 n.13 (D. Md. 2003) ("If shaping patent applications amounts to competitive decision-making, the Court has trouble imagining a patent prosecutor who would not meet that standard.").

Persuaded by the reasoning in *In re Sibia*, the Court adopts that interpretation of competitive decision-making in the patent prosecution context and will not deny an attorney

access to information without good cause based on the facts of the case. Thus far, there is no reason for the Court to believe that either Hetzler or FET&F will not strictly follow the stipulated protective order and refrain from using, either inadvertently or intentionally, Defendant's confidential information. Furthermore barring Hetzler or FET&F from prosecuting similar patents for two years following this suit, without some tangible reason or good cause other than the general threat of inadvertent misuse of discovered materials, is the exact type of overly broad and generalized fear rejected by the Federal Circuit in *U.S. Steel* and *In re Sibia*.

2. <u>Pipke</u>

Defendant argues that Pipke is a competitive decision-maker because he serves as Venture Gain's Chief Technology Officer and is a named inventor on several patents and applications assigned to Plaintiff. Defendant concludes that Pipke should be denied access to Defendant's confidential information. Plaintiff argues that Venture Gain is not a competitor of Defendant and Pipke is not a competitive decision-maker.

a. Defendant fails to show that Venture Gain is a competitor.

Defendant argues that Venture Gain is a competitor because (1) like Defendant, Venture Gain (according to its website) has business interests and applications in the areas of infrastructures security information management, (2) Venture Gain uses the same types of applications and technologies as Plaintiff (including Plaintiff's Similarity Based Modeling (SBM)

technology), and (3) three of Plaintiff's former top executives formed and manage Venture Gain. (Def.'s Br. at 6-7.)

Defendant's only evidence of actual competition between itself and Venture Gain is text taken from Venture Gain's website. In paragraph 8 of his declaration, Pipke, in his capacity as Chief Technology Officer of Venture Gain, states that Venture Gain's website was developed before the founders of Venture Gain decided what business to pursue and therefore lists various areas or markets that Venture Gain might potentially entertain, including genomics and pharmaceuticals, medical patient monitoring, infrastructure security information management, business intelligence, and process optimization. (Pl.'s Resp., Pipke Decl., ¶ 8.) Pipke goes on to explain that (1) Venture Gain's business activities have always been, since its inception and currently remain, exclusively in the life science area, (2) Venture Gain licensed the SBM technology for use only in the life science market and would be in breach of its license if it were to use SBM in any other market, and (3) Venture Gain's use of SBM technology and its business generally are directed outside of the equipment monitoring markets, precisely to avoid being competitive with Plaintiff (and concomitantly, with Defendant). (Id. ¶¶ 7-8; Pl.'s Resp. at 14-15.) At oral argument, Defendant admitted that it did not know what "life science" includes and that it does not have a strong understanding of Venture Gain's business activities. These admissions, combined with the lack of evidence of competition between Defendant and Venture Gain, support the Court's opinion that Venture Gain's managers and officers more accurately describe Venture Gain's business activities than does Defendant, and that Venture Gain is not competing for business or clients with Defendant.

Defendant suggests that it does not matter whether it competes with Venture Gain for business because the companies use the same technology (i.e., the '763 patent) and therefore compete in the same market as far as technology is concerned. The Court disagrees. Just because Venture Gain has a license to use Plaintiff's patent does not mean that Venture Gain is in competition with every party that challenges that patent. Furthermore, even if technological advances related to the '763 patent help Venture Gain, Venture Gain has explicitly renounced any uses of the patent that would compete with Defendant. As Venture Gain is not a party to this lawsuit and does not have overlapping business interests with Defendant, its mere use of SBM technology and the '763 patent is not enough to make it a competitor of Defendant as it pertains to Defendant's motion.

b. Pipke's former employment

Neither Pipke's former employment with Plaintiff, nor his status as a passive shareholder of Plaintiff, makes him a competitive decision-maker, as Defendant presents no evidence that Pipke exercises any control over Plaintiff or is involved in Plaintiff's business decisions. (Pl.'s Resp., Pipke Decl., ¶¶ 4-5.)

D. Protective Orders In Other Cases Are Not Relevant.

Finally, the Court is not persuaded by Defendant's references to a protective order in the case of *SmartSignal Corp. v. Randall L. Bickford, Expert Microsystems, Inc., Guardian Estate Invs., LLC, and Intellectual Assets, LLC*, Civil Action No. 05 C 4608 (N.D. Ill.) (The "Bickford

Case"). It appears that the protective order in the Bickford Case, entered on January 3, 2006, put restrictions on Hetzler and Pipke's access to confidential information for the duration of jurisdictional discovery but is to be reconsidered if federal jurisdiction is found to exist. (The Bickford Case, Docket No. 44.) Given its narrow focus, the protective order in the Bickford Case does not help to resolve the dispute now before the Court.

### III. Conclusion

For the reasons stated above, Defendant's motion to modify the stipulated protective order is denied.

**ENTER ORDER:**

*[signature]*
MARTIN C. ASHMAN

Dated: May 12, 2006.            United States Magistrate Judge

Copies have been mailed to:

| | |
|---|---|
| STEVEN C. SCHROER, Esq. | KEITH P. SCHOENEBERGER, Esq. |
| CHRISTINE A. ABUEL, Esq. | LeBoeuf, Lamb, Greene & MacRae, L.L.P. |
| Fitch, Even, Tabin & Flannery | 180 North Stetson Avenue |
| 120 South LaSalle Street | Chicago, IL 60601 |
| Suite 1600 | |
| Chicago, IL 60603 | MARK L. PETTINARI, Esq. |
| | Law Offices of Mark L. Pettinari |
| | 155 Samsome Street |
| | Suite 400 |
| | San Francisco, CA 94104 |
| | |
| Attorneys for Plaintiff | Attorneys for Defendant |